UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CARSTEN VOGEL on Behalf of Himself and Others
Similarly Situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK, P.O. LEONARDO
DEOLIVEIRA, Shield No. 3164, and P.O. "JOHN DOE"
#1-10 Individually and in their Official Capacity (the
name John Doe being fictitious as the true names are
unknown),

Defendants.

------------------------------------------------------------------X

**SECOND AMENDED CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**14 CV 9171 (RMB)(KNF)**

**ECF CASE**

Plaintiff Carsten Vogel, on behalf of himself and others similarly situated, by his attorneys, Cohen & Fitch LLP, complaining of the defendants, respectfully alleges as follows:

<u>PRELIMINARY STATEMENT</u>

1.     Plaintiff brings this action on behalf of himself and others similarly situated seeking compensatory damages, injunctive relief, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.     Under a pattern and practice set and enforced by city officials, the New York City Police Department ("NYPD") and its officers, P.O. LEONARDO DEOLIVEIRA, SHIELD NO. 3164, and P.O. "JOHN DOE"s #1-10, are unconstitutionally and illegally enforcing the provisions of Section 265.01(1) of the New York Penal Law ("NYPL") against individuals who are in legal and lawful possession of certain types of knives and/or blades that are not prohibited by any Federal or State law.

1

3.      Specifically plaintiff and others similarly situated are being stopped, seized, arrested, imprisoned, and prosecuted for possession of "gravity knives" under NYPL 265.01(1) when in fact the knives in their possession are unequivocally not - by definition, design, intent, common usage and/or function - "gravity knives," or otherwise illegal under the statute.

4.      This policy, pattern and practice is born from the NYPD's intentional misconstruction of and/or deliberate indifference to the proper definition of an illegal gravity knife under the law, which they believe includes any knife that is capable of being forcefully opened with one hand.

5.      As a result of their intentional or deliberately indifferent misunderstanding of what actually constitutes a gravity knife, the NYPD has utterly failed to properly train, educate and familiarize officers – both superior and subordinate – as to the appearance, design, look, function, and use of illegal "gravity knives" versus legal knives whose possession and use are not prohibited under New York State Law.

6.      Further, despite being on notice from numerous court decisions, abandoned prosecutions, and an overabundance of everyday common sense and practical knowledge readily known and/or obtainable, the NYPD continues to promulgate their tortured definition of a gravity knife through baseless arrests and prosecutions because the department utterly fails to recognize the difference between actually "gravity knives" and other folding knives that are undoubtedly legal, and to train its officers regarding same.

7.      The effect of this practice has literally caused *thousands* of unconstitutional arrests and prosecutions and has subjected the plaintiffs herein to handcuffing, detention, incarceration, prosecutions with tens of thousands of court appearances, and potential criminal

liability, in violation of their fundamental rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

8.      Accordingly, plaintiff Carsten Vogel seeks to represent a class of individuals consisting of all persons who have been or will be arrested in the absence of probable cause and charged with "gravity knife" possession under Penal Law Section 265.01(1) for knives that were legal, legitimate and not gravity knives and whose charges were ultimately dismissed.

**New York Penal Law Section 265.01(1) - The Relevant Statute**

9.       The plaintiff herein, and thousands of others similarly situated, have been falsely arrested, imprisoned, and prosecuted for violating NYPL Section 265.01(1) - specifically for allegedly possessing "gravity knives" - when in fact the items in their possession were unmistakably not gravity knifes under the statute.

10.     The relevant portion of  NYPL § 265.01(1) provides:

> A person is guilty of criminal possession of a weapon in the fourth degree when:
>
> (1) He or she possesses any firearm, electronic dart  gun,  electronic stun gun, *gravity knife*, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal  knuckles,  chuka stick,  sand  bag,  sandclub,  wrist-brace type slingshot or slungshot, shirken or "Kung Fu star";[1]

**New York Penal Law Section 265.00(5) - The Definition of a Gravity Knife**

11.     The basis of the false arrests and prosecutions of the putative plaintiff class stems from a fundamental ignorance - or deliberate disregard – of the appearance, mechanics, design and function of knives prohibited by New York Law under the classification of "gravity knives."

12.     The relevant portion of NYPL § 265.00(5) provides:

---

[1]   The putative plaintiff class does not challenge the legitimacy of any arrests under NYPL 265.01(1) that allege possession of anything other than a gravity knife (i.e. any firearm, electronic dart gun, electronic stun gun...switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star.").

As used in this article and in article four hundred, the following terms shall mean and include:

5. "Gravity knife" means any knife which has a blade which *is*[2] released from the handle or sheath thereof *by*[3] the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device.

13.     As defined by the penal law, to be properly and legally classified as a gravity knife, the knife in question must possess one crucial characteristic - namely, that either gravity or centrifugal force *must* be the *intended* mechanism, instrumentality, or agency by which the blade was *designed* to release from the handle.

14.     Conversely, consciously absent from the statute is any language that would suggest that a gravity knife defined as any knife which merely has the *capability* of being opened by the momentum created by a forceful whip of the arm or flick of the wrist.

15.     This is the crucial definitional characteristic that distinguishes an illegal gravity knife from those knives that may – with certain expertise, special coordination, strength or force – be opened by one hand but are not intended or *designed* to be opened in that manner.

16.     Despite this clear and unambiguous definition, for years the NYPD has either remained deliberately indifferent to training its officers on how to properly distinguish illegal "gravity knives" from legally purchased knives/tools, which are not by definition, design or function, "gravity knives," or has deliberately disregarded the proper definition of a gravity knife in favor of its own definition in contravention of the statute. This practice of deliberate indifference has perpetuated thousands of false arrests, detentions, and prosecutions, for possession of instruments alleged to be gravity knives, which in reality are not gravity knives and are therefore not illegal in any respect.

---

[2] "Is" as used in this article is the present singular of the intransitive verb "be," which refers to the "specific qualification" of an object. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th Ed. 2014)
[3] "By" as used in this article is defined as "through the agency or instrumentality of." Id.

**Common Folding Knives - Unmistakably NOT Gravity Knives**

17.    The plague of false arrests and prosecutions for alleged gravity knives stems from the NYPD's fundamental lack of awareness and training - or deliberate disregard - of the obvious and fundamental difference between an actual gravity knife and other common folding knives, such as Slip Joint, Liner Lock and Lockback knives which are fundamentally NOT gravity knives.

18.    Slip Joint knives were invented in the 1600's; they utilized a bar spring that applied pressure against the blade near the pivot point or fulcrum. In this type of knife design, the force and pressure of the internal bar spring was sufficient to hold the knife open and a certain amount of force exertion was required to close the knife blade back into the handle after it was open.

19.     Similarly, when the blade was in the closed position, opening the blade from the handle required a certain amount of pull force/exertion to overcome the pressure of the bar spring that held the blade closed. For this reason, two hands or the utilization of a thumb stud/groove were required to open and close the Slip Joint knife. The most common and obvious examples of a Slip Joint knives are the Swiss Army Knife or Camper knife utilized by most Boy Scouts throughout the country.

20.    Both Liner Lock and Lock back knives utilize relatively the same general design as Slip Joint Knives with the distinguishing characteristic generally being that when the blade is in the open position, it is held there by some type of locking mechanism.  Nowadays, Liner Lock and Lockback knives comprise the majority of legal utility knives in the United States.

**The Practical Definition and Common Understanding of a Gravity Knife Contemplated By the New York State Legislature**

21.     A "gravity knife" is a knife *designed specifically* to be opened by gravity or centrifugal force. A gravity knife – in contrast to many other common utility knives which have a bias towards closure – has no spring and no bias towards closure.

22.     As a result, the weight of the blade itself is the opening mechanism such that gravity or centrifugal force will cause the blade to move into the open position. Then, the blade must be locked into the open position, or else it would slide back into the handle as soon as any force was applied (e.g., during cutting or thrusting).

23.     Gravity knifes are designed in two forms:

(1) where the blade moves into position through the top of the handle such that when the top of the handle is faced downward, the force of gravity will - by itself - cause the blade to release or fall out of the handle into the locked position (hereinafter "Category I gravity knife"); or,

(2) where the blade moves into position out of the side of the handle such that when a person provides a *slight* amount of centrifugal or rotational force to the handle, the blade will slide out of the handle on the side, rotate on the fulcrum or hinge and lock into place at the top of the handle (hereinafter "Category II gravity knife").

24.     Originally, the earliest models of gravity knives were designed for military use. One of the most recognizable gravity knives is the World War II Luftwaffe Fallschirmjäger-Messer or German air force paratrooper knife. This was a Category I gravity knife and was issued to German paratroopers for the purpose of cutting a trapped parachutist from his rigging in case he landed with a tangled parachute and as a close combat weapon when necessary.

25.     From this original design came the origin of Category II gravity knives, opening from the side with only the slightest movement of the wrist. Their design and purpose was to enable the user to release the blade with one hand and minimal effort, to facilitate rapid defense in hand to hand combat.

26.     Neither design was intended for two handed operation (i.e. the necessity of both hands to deploy the blade) or to require the use of the thumb to deploy the blade, which is consciously absent on all true gravity knives.  These knives were deigned to have no resistance whatsoever against opening (i.e. bias) when in an unlocked position. This lack of bias facilitated speedy deployment of the blade.

27.     It was with knowledge of these *particular* knives in mind, and their propensity for violent use given the ease and speed in which the blade could be deployed, that the New York State legislature in 1958 moved to amend the Penal Law 265.01(1) to add the "gravity knife" to the list of prohibited weapons.

28.     Indeed, at the time the bill was passed, the gravity knife was called the "successor of the switchblade" do to the blades design for immediate deployment and the New York Attorney General had even characterized a gravity knife as having a blade that "*automatically opened by the force of gravity.*"

29.     One of the committee chairmen even commented during his discussion on the amendment to the Penal Law that such an amendment was necessary because of the knife's capacity to mirror the already illegal switchblade knife with a design that allowed the blade to "leap out with the flip of a wrist." Emma Harrison, *Group Seeks Ban of Gravity Knife*, N.Y. TIMES, Dec. 19, 1957.

**Bias Toward Closure – The Quintessential Difference Between a Legal knife and an Illegal Gravity Knife**

30.     Unlike the design of a gravity knife, all Slip Joint, Liner Lock and Lockback knives all share one common characteristic: they all have *a bias toward closure* and *require* pull force/exertion to deploy the blade from the handle of the knife.

31.     A bias toward closure is the pressure holding the knife blade in the closed position. In its simplest terms, a bias towards closure is best exemplified by the typical kickstand of a bicycle. Specifically, unless some level of force is used to overcome the bias toward closure the kick stand will remain "closed."   Conversely, without the bias toward closure, a kickstand would be deployed by any slight bump or *even by gravity alone* and drag along the street while the bicycle was being ridden.

32.     The antithesis of a bias toward closure is the switchblade knife, which uses a spring mechanism that is always deployed, which pushes the blade into the open position.  The simple idea is that the knife would always remain open *but for* the device holding it back from constantly ejecting out of the handle (this is referred to as an, "open bias.").

33.      Unlike the Slip Joint, Liner Lock and Lockback knives (which have a closed bias) and the Switchblade knife (which has an open bias), a true gravity knife has no bias whatsoever as part of its design. This means that without a lock for the blade itself, there is no mechanism whatsoever to hold the blade in either the open or closed position.

34.     An everyday example of a knife with no bias is an Old Fashioned Straight Razor, commonly used for shaving at a barber shop. This knife has no bias whatsoever and can be opened with no effort at all by moving ones hand in a circular motion (centrifugal force) or simply turning the knife sideways and letting the blade fall away from, or out of, the handle. In fact, but for the fact that an Old Fashioned Straight Razor has no locking mechanism to keep the

blade open when it is deployed, it would squarely fit into the definition of a "gravity knife" under NYPL 265.00(5).

35.     Consequently, a gravity knife *must* have *both* a mechanism to lock the blade in the open position when it is deployed and a lock to keep the blade in the closed position when it is closed. This keeps the blade from opening and closing inadvertently when the user does not intend so.

36.     While Liner lock and Lockback knives have a similar locking feature to keep the blade in the open position, the quintessential difference between the closed locking mechanism of a legal Liner lock or Lockback knife and an illegal gravity knife is that the lock is not the *sole* means of keeping the blade from opening. In fact in Liner lock and Lockback knives, this closed locking mechanism is a safety feature that merely enables the handler to release the blade, *but it is the bias toward closure* that prevents the blades in these knives from being deployed without the necessary pull force/exertion to otherwise release the blade from the handle.

37.     By contrast, any closed locking feature of a gravity knife is the *only* means of keeping the knife closed, which is why it can open merely with a mere rotation of the wrist or turning the knife upside down, and no actual exertion or effort at all is needed to release the blade.

38.     In other words, a true gravity knife will deploy easily through the use of gravity or centrifugal force by *anyone* who utilizes the knife because that it how the knife is designed to open.  By contrast, only a select few individuals – if any – will possess the strength, coordination and dexterity necessary to overcome the bias towards closure in other folding knives in order to deploy their blades with one arm.

39.     In sum, it is the existence of a bias toward closure, which every legal folding knife possesses; versus having no bias whatsoever that separates each and every gravity knife from those legal and lawful folding knives.[4]

**The *Mere Capability* of a Knife to be Forcefully Opened with One hand Does Not Transform a Legal Folding Knife into and Illegal Gravity Knife**

40.     Despite the fact that Slip Joint, Liner Lock nor Lockback knives are not designed, intended or readily capable of being opened through the use of centrifugal force, these knives may – by certain individuals possessing the know-how, skill, practice, coordination, strength and force – be capable of deployment by the force of momentum or inertia; however, because these knives were not the intended or designed to be opened in this manner, they are not, by definition, gravity knives, which differentiates them from the specific design and purpose of an actual gravity knife.

41.     Consequently, the mere fact that through skill, practice, strength or significant force or exertion, the blade may be deployed with one hand by forcefully jerking or whipping the arm or wrist does not transform these otherwise legal knives into illegal "gravity knives" prohibited under NYPL 265.01(1).

42.     Indeed, if the legislature had intended NYPL 256.01(1) to cover such legal folding knives, it is clear that the statute would have expanded the prohibition to any knife that has a blade which "*may* be released," "*is capable* of being released," or "*can* be released," by centrifugal force[5] or with one hand.

---

[4]  In a corollary Federal Statute, 15 U.S.C. §§ 1241-1245 the United States Government has clearly recognized the distinguishing characteristic between Slip Joint, Liner Lock and Lockback Knives and their illegal counterpart, the Gravity Knife.  Significantly, it exempts the former set of knives specifically because of their bias toward closure.  See 15 U.S.C. § 1244(5) ("this title shall not apply to -  a knife that contains a spring, detent, or other mechanism designed to create a bias toward closure of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife.")

[5]  It should be noted, that the force employed to overcome the bias in a folding in order to open it with one hand cannot be classified as "centrifugal force."  Rather, this force is more accurately described as momentum or inertia.

43.     However, the legislature chose to omit any such language and instead specifically enumerated the precise criteria that separates a gravity knife' design from every other legal folding knife in existence – namely, having a blade "which *is* released *by* the force of gravity or application of centrifugal force."

44.     Thus, it is clear that the legislature was referring *only* to those knives that are – by design – *specifically* intended to be opened through gravity or the use of centrifugal force and not such everyday common folding knives, which may, with certain unique skill, strength, and force, be forced, whipped or flicked open with one hand, even through it was never their intent or design.

**The NYPD's Intentional Disregard or Deliberate Indifference to the Distinction between Legal Knives and Illegal Gravity Knives**

45.     Between 2006 and 2008, the numbers of NYPL 265.01(1) arrests has increased exponentially by several thousand every year and has stayed consistently at approximately 7,000 arrests per year from 2009 through the present.

46.     Upon information and belief the majority of the arrests under this charge are specifically related to alleged gravity knife possession.

47.     Moreover, the drastic increase in this particular offense - specifically for possession of alleged gravity knives - has been a direct result of the increasing usage and sale of common utility folding knives, slip joint knives and the NYPD's deliberate ignorance and/or indifference to the distinction between these knives and actual gravity knives that are prohibited by statute.

48.     These false arrests are made with deliberate disregard or indifference regarding the legality of the knives allegedly being possessed and without any appropriate testing, or examination to determine same.

49.     Due to the NYPD's utter failure to train its officers as to the distinct difference between legal and illegal knives, and/or the NYPD's explicit/implicit indifference or disregard to the distinction between legal knives and illegal gravity knives, thousands of innocent individuals have been falsely arrested and prosecuted.

50.     As a result of this policy pattern and practice of intentionally disregarding the characteristics of an actual gravity knife in favor of their own definition of a gravity knife in contravention of 265.01(1) or being otherwise deliberately indifference to training and proper differentiation between legal knives and illegal gravity knives, thousands of individuals have been stopped, searched, arrested and prosecuted in violation of their rights as secured by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION

51.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

52.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a) and 1367.

## VENUE

53.     Venue is properly laid in the Southern District of New York under U.S.C. § 1391(b), in that this is the District in which a substantial part of the events or omissions giving rise to the claim occurred.

## JURY DEMAND

54.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## FACTS

55.     Plaintiff CARSTEN VOGEL is a thirty-seven (37) year old Caucasian male and at all relevant times a resident of the City and State of New York.

56.     At all times hereinafter mentioned, the individually named defendants, P.O. LEONARDO DEOLIVEIRA, SHIELD NO. 3164, and P.O. "JOHN DOE"'s #1-10, were duly sworn NYPD officers of said department and were acting under the supervision of said department and according to their official duties.

57.     At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York. Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant, CITY OF NEW YORK.

58.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by defendant, CITY OF NEW YORK.

59.     Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

60.     Defendant CITY OF NEW YORK maintains the NYPD, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York, who was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD

personnel, including the defendants referenced herein. In addition, at all relevant times, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and of the State of New York.

61.    That at all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or New York, Bronx, Kings, Queens and Richmond Counties.

62.    During all times mentioned in this complaint, the defendants and each of them separately and in concert, engaged in acts and/or omissions which constituted deprivations of plaintiffs' constitutional rights, equal protections and the privileges and immunities of the plaintiffs, and while these acts were carried out under color of law, they had no justification or excuse, and were instead illegal, improper, and unrelated to any activity in which state officers may appropriately and legally engage in the course of protecting persons and/or ensuring civil order.

### *The Constitutional Violations against Carsten Vogel*

63.    At all relevant times mentioned herein, plaintiff VOGEL, possessed a legal utility knife which he used in connection with his employment as a self employed musician. Specifically, plaintiff VOGEL uses said legal knife to set up public announcement (hereinafter "PA") equipment, which requires him to cut tape and cables.

64.    At all relevant times mentioned herein, plaintiff VOGEL has always possessed his utility knife in compliance with all applicable laws, and was and is legally entitled to posses the utility knife in the places where the incidents giving rise to this lawsuit took place.

65.    On or about January 20, 2015 at approximately 4:58 p.m., plaintiff VOGEL was

lawfully present in the vicinity of Nostrand Avenue and Fulton Street, in Brooklyn, New York.

66.    Plaintiff VOGEL was waiting for the A train at the Nostrand Avenue Station on his way to work, when the above captioned NYPD Police Officers arrested plaintiff VOGEL without probable cause to do so.

67.    The NYPD officers stopped plaintiff VOGEL and immediately began to search him for no apparent reason, finding a utility knife which plaintiff VOGEL was legally entitled to possess for work.

68.    Despite the fact that plaintiff VOGEL explained to the NYPD officers that he uses the utility knife for his job as a self employed musician – for the purpose of cutting tape and cables while setting up public announcement PA equipment – the officers detained him on unknown charges for several hours, until he was released with a Desk Appearance Ticket charging him with Criminal Possession of a Weapon in the 4th Degree, pursuant to New York Penal Law § 256.01(1).

69.    Subsequently, plaintiff VOGEL made approximately one (1) court appearance until all charges against him were Adjourned in Contemplation of Dismissal on March 11, 2015.

70.    As a result of his arrest, plaintiff VOGEL sustained, inter alia, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of his constitutional rights.

71.    Plaintiff VOGEL and others similarly situated possessing legal utility knives were and continue to be falsely arrested, charged  and selectively prosecuted for violating sections of the New York Penal Law that do not apply to the legal knives that they possessed at the time of their arrest.

72.    At no time during the relevant statutory period was plaintiff VOGEL ever in

violation of New York Penal Law Section 265.01(1) because under the law it is legally impossible for persons who possess legal utility knives to violate this law, given that the knife in question does not meet the statutory definition of a gravity knife under New York Penal Law Section 265.00(5).

73.     At no time during the relevant statutory period was plaintiff VOGEL ever in violation of any of the proscriptions of New York Penal Law Section 265.01(1), the applicable law governing the possession of illegal gravity knives.

74.     At no time during the relevant statutory period did plaintiff VOGEL commit any crime or violation of law to justify his arrest, seizure, detention, or prosecution.

75.     As a result of the actions and policy promulgated by defendants plaintiff VOGEL has suffered injuries of a constitutional dimension, including but not limited to, existing and continuing violations of his civil and constitutional rights under the Fourth, and Fifth Amendments to the Constitution.

## FIRST CLAIM FOR RELIEF FOR DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983

76.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

77.     All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

78.     All of the aforementioned acts deprived plaintiffs of the rights, equal protections, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

79.     The acts complained of were carried out by the aforementioned individual

defendants in their capacities as NYPD officers, with all of the actual and/or apparent authority attendant thereto.

80.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as NYPD officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

81.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**SECOND CLAIM FOR RELIEF**
**FALSE ARREST UNDER 42 U.S.C. § 1983**

82.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

83.    As a result of defendants' aforementioned conduct, plaintiffs were subjected to an illegal, improper, and false arrests in the form of custodial arrests and detentions and/or the issuance of Desk Appearance Tickets by the defendants, and prosecuted by the defendants in criminal proceedings, without any probable cause, privilege, consent or any legitimate basis under the law.

84.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiffs sustained the damages hereinbefore alleged.

85.    As a result of the foregoing, plaintiffs' liberty was restricted for an extended period of time, and they were put in fear for their safety, were humiliated and subjected to handcuffing, and other physical restraints, without probable cause.

### THIRD CLAIM FOR RELIEF FOR
### MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

86.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

87.     Defendants caused plaintiffs to be arrested in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrests were not based on probable cause or any legitimate basis under the law in violation of the constitutional rights of plaintiffs.

88.     Defendants caused plaintiffs to be arrested in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrests were not based on probable cause or any legitimate basis under the law and knowing that plaintiffs would be required to appear in court to be prosecuted under the aforementioned unconstitutional arrests in violation of the constitutional rights of plaintiffs.

89.     The acts complained of were carried out by the aforementioned individual defendants and subordinate officers of the NYPD officers, including P.O. LEONARDO DEOLIVEIRA, Shield No. 3164 and P.O. "JOHN DOE"'s #1-10 in their capacities as NYPD officers and officials, with all the actual and/or apparent authority attendant thereto.

90.     The acts complained of were carried out by the aforementioned individual defendants and subordinate NYPD officers, including P.O. LEONARDO DEOLIVEIRA, Shield No. 3164 and P.O. "JOHN DOE"'s #1-10 in their capacities as NYDPR officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and NYPD, all under the supervision of other ranking officers of said departments.

91.     The pattern of unconstitutional arrests established by policy-making officials within the NYPD and the City of New York, the failure to train officers and employees regarding

the distinctions between legal folding knives and illegal gravity knives, and the failure to supervise and/or discipline staff responsible for the unconstitutional arrests are so institutionalized as to represent a policy or custom of unconstitutional violations that have resulted in the deprivation of plaintiffs' rights.

92.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York, the NYPD include, but are not limited to, the following unconstitutional practices:

a)    Explicitly and/or implicitly establishing a policy of falsely arresting individuals who possess legal utility knives in order to intimidate and harass individuals who carry them;

b)    Making arrests without probable cause or any legal basis in order to promulgate the City's deliberately flawed interpretation of a gravity knife;

c)    Showing deliberate indifference to whether the arrests made pursuant to that were made based on probable cause or with the proper application of the New York Penal Law;

d)    Showing deliberate indifference to the training of subordinate officers to not arrest individuals unless they are arrested upon probable cause or a basis under the law in accordance with the proper standards under the New York Penal Law;

e)    Showing deliberate indifference to training officers as to the difference between gravity and non-gravity knives;

f)    Having no check or balance in place to verify the legality of these knives;

g)    Showing deliberate indifference to the supervision of subordinate officers in the NYPD for the arrests in determining whether the alleged "gravity knives" were legitimate;

h)    Making the aforementioned arrests notwithstanding clearly established law prohibiting them; and/or;

i)    Specifically instructing officers on using an improper test or manner to check the functionality of a knife that specifically includes legal folding knives within the definition of gravity knives;

j)      Utilizing an improper test or manner to check the functionality of a knife that specifically includes legal folding knives within the definition of gravity knives;

k)      Failing to properly instruct and educated officers regarding the proper definition of centrifugal force;

l)      City policymakers continued constructive acquiescence to repeated and continuing constitutional violations of individuals who are being illegally arrested and prosecuted;

93.     The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as is the case with the two (2) plaintiffs in this matter as well as the NYPD's own statistics and statistics and reports maintained by other City Agencies.

94.     The foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD constituted a deliberate indifference to the safety, well-being and constitutional rights of plaintiffs.

95.     The foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD were the direct and proximate cause of the constitutional violations suffered by plaintiffs as alleged herein.

96.     The foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD were the moving force behind the constitutional violations suffered by plaintiffs as alleged herein.

97.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD, plaintiffs were arrested without probable cause or any legal basis and in many instances were subjected to detention, search, restraints, handcuffing and verbal and mental abuse in violation of their constitutional rights.

98.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD, plaintiffs were caused to appear in court to be prosecuted on these unconstitutional arrests and in many instances causing them to lose time from work or school in violation of their constitutional rights.

99.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD, plaintiffs were targeted, stopped and unconstitutionally arrested in violation of their rights under the Fourth Amendment.

100.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of plaintiffs.

101.     Defendants, collectively and individually, while acting under color of state law, acquiesced in and encouraged a pattern of unconstitutional conduct by subordinate NYPD officers, and were directly responsible for the violation of the constitutional rights of plaintiffs.

102.     All of the foregoing acts by defendants deprived plaintiffs of federally protected rights, including, but not limited to, the right:

ii.     Not to be deprived of liberty without due process of law;

iii.     To be free from search, seizure and arrest not based upon probable cause; and,

iv.     To receive equal protection under the law;

**WHEREFORE**, plaintiffs request the following relief jointly and severally as against all of the defendants:

1.     A judgment declaring that defendants have committed the violations of law alleged in this action;

2.     An order preliminarily and permanently enjoining and directing defendants to cease enforcement of this policy of making illegal arrests;

3.      Directing that immediate remedial training on the proper and legal grounds for arrests be provided to all current members of the NYPD (in the Precincts and the NYPD academy);

4.      Directing defendants to put in place a system for monitoring the arrests and the legal basis for them so that baseless arrests that have been made can be immediately dismissed;

5.      Compensatory damages against all defendants in an amount to be proven at trial;

6.      Punitive damages against all defendants, except the City, in an amount to be proven at trial;

7.      An order awarding disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988;

8.      Such other further relief that the court may deem just and proper.


Dated: New York, New York
       December 13, 2016



                              BY:_____/S_____
                                  COHEN & FITCH LLP
                                  JOSHUA P. FITCH (JF-2813)
                                  GERALD M. COHEN (GC-0414)
                                  233 Broadway, Suite 1800
                                  New York, N.Y. 10279
                                  (212) 374-9115
                                  jfitch@cohenfitch.com
                                  gcohen@cohenfitch.com